# BRIAN WASKO ET AL. *v.* JAMES MANELLA
## (SC 16917)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued January 12—officially released June 8, 2004

*Jon Berk*, with whom was *Erik E. Roberts*, for the appellant (substitute plaintiff).

*John C. Turner, Jr.*, for the appellee (defendant).

*Opinion*

NORCOTT, J. In this certified appeal, we must determine whether the Appellate Court properly reversed the judgment of the trial court, rendered after a trial to the court, in favor of the substitute plaintiff, Middlesex Mutual Assurance Company (Middlesex).[1] *Wasko* v.

---

[1] Middlesex is the substitute plaintiff subrogee for the subrogors, Brian Wasko and Phyllis Wasko, the insured homeowners who no longer are parties in interest in this action.

*Manella,* 74 Conn. App. 32, 44, 811 A.2d 727 (2002). We conclude that the Appellate Court improperly determined that a social guest in a personal residence is immune from liability for negligently caused fire damages in a subrogation action brought by the homeowner's insurance carrier. Accordingly, we reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history of this case. "In 1993, Brian Wasko and Phyllis Wasko, residents of Weston, owned a house on Shore Road in Goshen that they used primarily on weekends and vacations. [The defendant, James] Manella was a friend and business associate of the Waskos who had recently moved to New York City. The Waskos offered to let [the defendant] stay at their house in Goshen on the weekend of February 5, 1993, with the proffered hope that he might be interested in renting or buying it in the future. [The defendant] accepted that offer. While at the house in Goshen, he lit a fire in the fireplace, and, when he was ready to return to New York, he emptied the ashes and embers into a paper bag, which he placed outside on the porch. After he departed, the house caught fire and was substantially destroyed. The fire marshal of the town of Goshen determined that the ashes and embers in the paper bag had caused the blaze.

"The house was insured under a homeowners policy from Middlesex. Pursuant to the insurance policy, Middlesex paid the Waskos $48,500 for the lost personal property and $84,005 for the lost dwelling for a total of $132,505. In October, 1993, the Waskos brought an action against [the defendant] sounding in negligence, recklessness and res ipsa loquitur. In March, 1997, Middlesex was substituted as the real party in interest.

"On April 14, 2000, [the defendant] filed a motion for summary judgment on all counts, of which only the

negligence count survived. At that time, [the defendant] argued that Middlesex had no right of subrogation and that a social houseguest should be considered an 'implied co-insured' under the policy. The [trial] court was unpersuaded. On October 13, 2000, it held, in a memorandum of decision, that Middlesex could subrogate the Waskos' claim because the homeowners policy did not specify coverage for social guests. In short, [the defendant] was not an insured under the terms of the policy.

"In the subsequent trial to the court on July 24 and 25, 2001, the court found that [the defendant] had been negligent and that his negligence had caused the destruction of the Waskos' house and personal property. The court awarded Middlesex $132,505 in damages." Id., 33–34.

The defendant appealed to the Appellate Court, claiming that the trial court: (1) improperly had found that Middlesex had a right of subrogation against a social guest; (2) improperly had precluded Brian Wasko from testifying as to his understanding of the scope of coverage of his insurance policy; and (3) inaccurately had calculated the replacement value of the personal property. Id., 34–35. Addressing the defendant's first claim, the Appellate Court determined initially that Middlesex's right of subrogation was equitable, and not contractual, in nature. Id., 38. Accordingly, the Appellate Court reviewed *DiLullo* v. *Joseph*, 259 Conn. 847, 848, 792 A.2d 819 (2002), in which this court concluded that a landlord's insurer did not have a right of subrogation against a tenant who negligently had damaged the insured property. Applying the reasoning of *DiLullo* to the present case, the Appellate Court determined that allowing the insurer to pursue a subrogation action against a houseguest would lead to economic waste and would place an even greater "strain on the limits of equity" than the factual situation presented in *DiLullo*.

*Wasko* v. *Manella,* supra, 74 Conn. App. 39. Accordingly, the Appellate Court concluded, with one judge dissenting, that "in keeping with *DiLullo,* subrogation should not be allowed against a houseguest whose negligence causes damage to the property of an insured homeowner." Id., 44.[2]

We thereafter granted the Middlesex's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly reverse the decision of the trial court, and extend this court's opinion in *DiLullo* v. *Joseph,* [supra, 259 Conn. 847], in the context of landlord/tenant, by holding that a guest in a personal residence is immune from liability for negligently caused damages in a subrogation action brought by the homeowner's insurance carrier?" *Wasko* v. *Manella,* 262 Conn. 942, 942–43, 815 A.2d 674 (2003). This appeal followed.

On appeal, Middlesex claims that the Appellate Court's reversal of the judgment of the trial court was improper because the Appellate Court: (1) failed to recognize that the subrogation right being enforced was granted by statute, and not by principles of equity; (2) confused the concept of third party liability coverage protecting an insured from damages caused to another with the concept of first party coverage protecting an insured from damage to their own property; and (3) improperly expanded the analytical framework of *DiLullo* v. *Joseph,* supra, 259 Conn. 847, to the facts of the present case. In response, the defendant contends that: (1) Middlesex does not have a statutory right of subrogation; (2) the Appellate Court properly applied *DiLullo* to the facts of this case; and (3) the Appellate Court properly determined that premiums for temporary fire insurance policies that covered guests during

[2] This conclusion made it unnecessary for the Appellate Court to address the defendant's two remaining claims.

their stay would be difficult to calculate. We agree with the defendant that the Appellate Court properly concluded that Middlesex's right of subrogation was equitable, and not statutory, in nature. We also agree with Middlesex, however, that under the doctrine of equitable subrogation, the Appellate Court improperly extended the analytical framework of *DiLullo* to the facts of the present case. Accordingly, we reverse the judgment of the Appellate Court.

I

Middlesex first claims that the Appellate Court improperly failed to recognize that the subrogation right being enforced was granted by statute, and not by principles of equity. The defendant contends that the Appellate Court properly concluded that Middlesex's right of subrogation was equitable, and not statutory, in nature. We agree with the defendant.

"The law has recognized two types of subrogation: conventional; and legal or equitable. 73 Am. Jur. 2d 599, Subrogation § 2 (1974 and 1995 Sup.) . . . . Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid. . . . By contrast, [t]he right of [legal or equitable] subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect. . . . The object of [legal or equitable] subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. . . . As now applied, the doctrine of [legal or] equitable subro-

gation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." (Citations omitted; internal quotation marks omitted.) *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 370–71, 672 A.2d 939 (1996).

Under this legal framework, the Appellate Court noted that "[a]t first blush," this case would appear to involve conventional subrogation, due to the insurance contract between the Waskos and Middlesex. *Wasko* v. *Manella*, supra, 74 Conn. App. 36–37. Upon further analysis, however, the Appellate Court concluded that "[t]he contract . . . is not the source of the right, but rather is a reference to those rights that may exist at law or in equity." Id., 37. We agree with this conclusion. As we stated in *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 372, insurers that are obligated by a *preexisting* contract to pay the losses of an insured proceed in a subsequent action against the responsible party under the theory of equitable subrogation, and not conventional subrogation. See also *DiLullo* v. *Joseph*, supra, 259 Conn. 853 (equitable principles used to address fire insurance company's claimed right of subrogation against negligent tenant); *Hanover Ins. Co.* v. *Fireman's Fund Ins. Co.*, 217 Conn. 340, 344, 586 A.2d 567 (1991) (affirming trial court's finding that equitable subrogation action by insurance company was untimely). This is because the insurer, as well as the insured, has a preexisting financial interest in the outcome of the litigation. *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 372; *Berlinski* v. *Ovellette*, 164 Conn. 482, 496, 325 A.2d 239 (1973) (*MacDonald, J.*, dissenting), overruled, *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 364. In sum, while "[a] right of true [equitable] subrogation may be provided for in a

contract . . . the exercise of the right will . . . have its basis in general principles of equity rather than in the contract, which will be treated as being merely a declaration of principles of law already existing." 83 C.J.S., Subrogation § 3 (b) (1953).[3]

Middlesex attempts to distinguish the subrogation clause in the present contract by noting that "[t]he legislature, in the context of fire insurance policies, has specifically granted a right of subrogation to a fire insurance company for all rights of recovery that the insured has against the tortfeasor." Moreover, Middlesex contends that this "statutory right of assignment for its loss is *inviolate* . . . [and] the court may not substitute its judgment for a grant of statutory recovery given by the legislature . . . ." (Emphasis added.) We are unpersuaded.

"Issues of statutory construction raise questions of law, over which we exercise plenary review." *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 588, 830 A.2d 164 (2003). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine,

[3] See also *Hartford Accident & Indemnity Co.* v. *Chung,* 37 Conn. Sup. 587, 592, 429 A.2d 158 (1981) ("[t]he right of legal subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect"); M. Quinn, "Review Essay—Subrogation, Restitution, and Indemnity," 74 Tex. L. Rev. 1361, 1389 (1996) ("[i]t is puzzling why insurance contracts contain contractual subrogation clauses when subrogation is automatic . . . the subrogation agreement can express nothing more than what the law would automatically provide"); S. Kimball & D. Davis, "The Extension of Insurance Subrogation," 60 Mich. L. Rev. 841, 842 (1962) ("[a]lthough subrogation clauses are very common in insurance policies, on the whole they merely confirm rights that would exist without them, and at most they alter the incidence of legal subrogation in some particulars"); 73 Am. Jur. 2d, Subrogation § 15 (2001) ("[e]quitable subrogation is committed to the equitable powers of the court which, in the exercise of its discretion, may be awarded and although these powers may be confirmed by contractual provisions, they may not be expanded by them").

in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Jones* v. *Kramer*, 267 Conn. 336, 343, 838 A.2d 170 (2004).[4]

The Connecticut legislature has enacted a standard form of fire insurance, with which all fire insurance policies issued in this state must conform. See General Statutes § 38a-308.[5] In regard to the insurer's subrogation rights, the standard form includes a subrogation provision stating: "This Company may require from the insured an assignment of all right of recovery against

[1] Public Acts 2003, No. 03-154, § 1, provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." We note that, in this question of first impression, the relevant statutory text, in connection with the relationship of that text to other statutes, is not plain and unambiguous. Accordingly, our analysis is not constricted by this legislation.

[5] General Statutes § 38a-308 (a) provides in relevant part: "No policy or contract of fire insurance shall be made, issued or delivered by any insurer or any agent or representative thereof, on any property in this state, unless it conforms as to all provisions, stipulations, agreements and conditions with the form of policy set forth in section 38a-307. . . ."

Subsection (b) of § 38a-308 allows insurers to issue a nonconforming policy, however, so long as "(1) such policy or contract shall afford coverage, with respect to the peril of fire, not less than the substantial equivalent of the coverage afforded by said standard fire insurance policy, (2) the provisions in relation to mortgagee interests and obligations in said standard fire insurance policy shall be incorporated therein without change, (3) such policy or contract is complete as to all of its terms without reference to any other document and (4) the commissioner is satisfied that such policy or contract complies with the provisions hereof."

any party for loss to the extent that payment therefor is made by this Company."[6] General Statutes § 38a-307. We conclude that this provision, when incorporated into a contract for fire insurance issued in this state, does not provide the insurer with an inviolate statutory right of subrogation.

"As with any issue of statutory construction, we begin with the pertinent language of the statute." *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 268 Conn. 222, 232, 842 A.2d 1089 (2004). The subrogation clause set forth in § 38a-307 fails to provide an insurer with a direct, and inviolate, right of subrogation. To the contrary, it merely provides that an insurer "may require" an insured to assign any rights *he or she* has to the insurer. Thus, under this clear language, the right of recovery belongs to the insured, and the insurer only obtains that right when the insured grants it. This is true because it is axiomatic that "a subrogee merely succeeds to the legal rights or claims of a subrogor." 73 Am. Jur. 2d 542, Subrogation § 1 (2001); see also *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, 123 Conn. 232, 238, 193 A. 769 (1937). Indeed, as the contract in the present case demonstrates, the insured had the ability to waive any rights of recovery prior to the occurrence of a loss. See footnote 6 of this opinion. Contrary to the claim set forth by Middlesex, therefore, the language of § 38a-307 does not expressly provide an insurer with an inviolate right to bring a subrogation action.

This conclusion is buttressed by a comparison of the treatment of subrogation under the standard form of fire insurance and under our workers' compensation scheme. *Hatt* v. *Burlington Coat Factory*, 263 Conn.

---

[6] The subrogation clause in the contract between the Waskos and Middlesex was a mirror image of this statutory language, providing: "An insured may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us."

279, 310, 819 A.2d 260 (2003) ("the legislature is always presumed to have created a harmonious and consistent body of law" [internal quotation marks omitted]). More specifically, General Statutes § 31-293 (a), addressing the liability of third parties for payments of workers' compensation benefits, provides that the employer's claim "shall take precedence over that of the injured employee in [distribution of] the proceeds of the recovery . . . ."[7] The standard form of fire insurance lacks such a provision, and, under traditional principles of subrogation, if an insured brings an action against a negligent party, an insurer generally is entitled to recover the amount it paid to the insured only if the amount of damages awarded exceeds the difference between the amount the insurer paid and the insured's actual damages.[8]

More importantly, in § 31-293 the legislature specifically granted employers an independent right to bring an action against the tortfeasor to recover any amount paid to their injured employee. *Doucette* v. *Pomes*, 247 Conn. 442, 468, 724 A.2d 481 (1999). Section 31-293 (a)

[7] For this reason, one commentator has stated that, rather than viewing such a statute as granting an insurer a right to subrogation, it seems more appropriate to view them as "statutory liens in favor of insurance carriers." M. Quinn, "Review Essay—Subrogation, Restitution, and Indemnity," 74 Tex. L. Rev. 1361, 1371 (1996).

[8] See, e.g., *Skauge* v. *Mountain States Telephone & Telegraph*, 172 Mont. 521, 528, 565 P.2d 628 (1977) (reviewing various theories and "adopt[ing] the view that when the insured has sustained a loss in excess of the reimbursement by the insurer, the insured is entitled to be made whole for his entire loss and any costs of recovery, including attorney's fees, before the insurer can assert its right of legal subrogation against the insured or the tort-feasor"); *Transamerica Ins. Co.* v. *Barnes*, 29 Utah 2d 101, 105, 505 P.2d 783 (1972) ("[e]quitable principles apply to subrogation, and the insured is entitled to be made whole before the insurer may recover any portion of the recovery from the tortfeasor"); 6A J. Appleman, Insurance Law and Practice (1972) § 4094, p. 265 ("[b]ut where the loss was greater than the insurance, and the insured settled with the wrongdoer for damages which, when added to the insurance, were less than the loss, the insurer could recover nothing from the insured").

provides in relevant part that "any employer or the custodian of the Second Injury Fund, having paid, or having become obligated to pay, compensation under the provisions of this chapter *may bring an action against such person* to recover any amount that he has paid or has become obligated to pay as compensation to the injured employee. . . ." (Emphasis added.) Such explicit statutory language simply is not present in the standard form of fire insurance set forth in the subrogation provision of § 38a-307, which provides only that an insurer "may require" from an insured any "right of recovery" that the insured has against any responsible party. If, as Middlesex contends, § 38a-307 grants an insurer an inviolate statutory right to subrogation against a negligent tortfeasor, it would be reasonable to expect to see language similar to that found in § 31-293. *Hatt* v. *Burlington Coat Factory*, supra, 263 Conn. 310 ("the legislature is always presumed to have created a harmonious and consistent body of law" [internal quotation marks omitted]). Indeed, the subrogation provision of § 38a-307 does not even automatically subrogate an insurer to any rights held by its insured, but rather provides merely that it *"may* require" those rights. (Emphasis added.) Compare 52 Mich. Comp. Laws § 500.2833 (1) (r) (2001) (any fire insurance policy shall contain provision stating "[t]hat the insurer *is subrogated* to the insured's right of recovery from other parties" [emphasis added]). Thus, in § 38a-307, the legislature has not explicitly granted the insurer either: (1) an automatic right to be subrogated to any rights held by the insured, as have other states; or (2) an independent right to bring an action, as our legislature has granted under § 31-293 (a).[9]

---

[9] The difference between the subrogation clauses in the workers' compensation statutes and the standard form of fire insurance arises from the common-law principles underlying those two areas of law. The common law did not permit the assignment of personal injury actions, and thus the legislature specifically, and explicitly, had to abrogate the common law in order to allow an employer to subrogate against a tortfeasor. *Westchester*

In addition to conflicting with the actual language of the standard form of fire insurance, the interpretation proposed by Middlesex conflicts with this court's prior interpretations of other provisions of that standard form. More specifically, rather than interpret the standard form of fire insurance as providing statutory rights, we consistently have interpreted it as merely setting forth legislatively mandated contractual terms, which, once incorporated into an insurance policy, are contractual terms that may be "trumped" by principles of equity.[10] For example, in *Boyce* v. *Allstate Ins. Co.*, 236 Conn. 375, 377, 673 A.2d 77 (1996), the defendant insurance company claimed that because it did not expressly

*Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 373. This was accomplished with the enactment of the Workers' Compensation Act, and specifically § 31-293. In the area of insurance contracts, however, equitable principles traditionally allowed subrogation against the responsible party when an insurer paid for damages pursuant to an indemnity agreement. Thus, when enacting a standard form of insurance, the legislature did not need to create a new right of subrogation for insurers because they were already provided with one through equitable principles. *Orvis* v. *Newell*, 17 Conn. 97, 101 (1845) ("[i]t is, however, to be remarked, that his right of substitution or subrogation rests upon the basis of mere equity and benevolence" [internal quotation marks omitted]).

[10] The legislative history of the current standard form of fire insurance, while not extensive, does provide some evidence of two primary motivations behind the adoption of the current form: (1) to reduce an agent's workload; and (2) to provide consumers with a consistent and easily understandable form of insurance. In 1945, the legislature adopted a new standard form of fire insurance based upon the 1943 New York standard fire insurance policy. See Public Acts 1945, No. 266 (P.A. 266). During a public hearing prior to the enactment of P.A. 266, Commissioner Ellery Allyn testified: "As you know, the fire policy in use at the present time in Connecticut is the New York policy of 1886 . . . [and] it has been usable only by reason of the fact that it has been covered with all sorts of riders and endorsements. This new type [set forth in P.A. 266] . . . is a shorter form, with more readable language. . . . We feel the interest of the public can be served by this modern type of policy." Conn. Joint Standing Committee Hearings, Insurance, Pt. 1, 1945 Sess., p. 37. In addition, B.F. Wilcox, a member of the legislative committee of the Connecticut Association of Insurance Agents testified: "We feel that the public will be better served by the adoption of such a policy and the agents saved a great deal of labor in preparation of policies for their client." Id.

waive, pursuant to the statutorily mandated nonwaiver provision,[11] the statutorily mandated provision that required the plaintiff insurer to initiate an action on the policy within one year from the date of loss,[12] it was entitled to judgment notwithstanding the verdict. To the contrary, the plaintiff claimed that the doctrine of equitable estoppel precluded the defendant from asserting as a defense the provision limiting the time for the plaintiff to commence an action to one year from the date of loss. Id., 383. Although we agreed that the plaintiff could challenge the defendant's reliance on that provision under the doctrine of equitable estoppel, we found the plaintiff's particular challenge to be deficient. Id. In so doing, however, we emphasized that: "This court [does not intend] to advance the cause of the unscrupulous . . . and, therefore, we decline to adopt the defendant's argument that the legislatively mandated nonwaiver provision precludes an insured from asserting equitable estoppel whenever the insured fails to obtain a written waiver, no matter what the insurer does or does not do that might mislead the insured. Accordingly, we conclude that the principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong . . . *trumps* the defendant's position that the non-

---

[11] General Statutes § 38a-307 provides in relevant part: "The standard form of fire insurance policy of the state of Connecticut . . . shall be as follows . . .

"Waiver provisions. No permission affecting this insurance shall exist, or waiver of any provision be valid, unless granted herein or expressed in writing added hereto. No provision, stipulation or forfeiture shall be held to be waived by any requirement or proceeding on the part of this Company relating to appraisal or to any examination provided for herein. . . ."

[12] General Statutes § 38a-307 provides in relevant part: "The standard form of fire insurance policy of the state of Connecticut . . . shall be as follows . . .

"Suit. No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss. . . ."

waiver provision of § 38a-307 precludes the plaintiff's estoppel argument." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 384–85; see also *Bocchino* v. *Nationwide Mutual Fire Ins. Co.*, 246 Conn. 378, 381, 716 A.2d 883 (1998) (rejecting plaintiff's contention that defendant's "insurance policy provision requiring that an action be brought within one year of the date of the loss was mandated by the standard fire insurance policy form delineated in §§ 38a-308 [a] and 38a-307, and was, therefore, a 'time limited by law' within the meaning of the savings provision of [General Statutes] § 52-592 (a)," the accidental failure of suit statute); *Hanover Ins. Co.* v. *Fireman's Fund Ins. Co.*, supra, 217 Conn. 350 (addressing, yet rejecting, plaintiff insurer's claim that defendant insurer was estopped by its actions from enforcing one year limitation set forth in § 38a-307 and relevant insurance policy).[13] Thus, this court continually has declined to interpret the provisions of the standard form in the manner urged by Middlesex, and we can find no compelling reason to do otherwise in the present case.

Finally, we note that our conclusion in the present case accords with the approach taken by other jurisdictions. See, e.g., *Sapiano* v. *Williamsburg National Ins. Co.*, 28 Cal. App. 4th 533, 538, 33 Cal. Rptr. 2d 659 (1994) ("[a]lthough insurers may place subrogation clauses in their policies [such as California standard form of fire insurance] . . . those provisions typically are general and add nothing to the rights of subrogation arising by law"); *Dunton* v. *Westchester Fire Ins. Co.*, 104 Me. 372, 378, 71 A. 1037 (1908) ("[t]he Maine Standard [fire insurance] policy, though its form is prescribed by stat-

---

[13] See also *Lees* v. *Middlesex Ins. Co.*, 219 Conn. 644, 650, 594 A.2d 952 (1991) (narrowly construing provisions of § 38a-307 and concluding that plaintiff's claims under Connecticut Unfair Insurance Practices Act and Connecticut Unfair Trade Practices Act were not subject to provision set forth in standard form of fire insurance limiting period to bring action under policy to one year).

ute, is not to be treated as a legislative enactment after it has been accepted by the parties, but as a voluntary contract, which, like any other contract, derives its force and efficacy from the consent of the parties"); *Norton* v. *Home Ins. Co.*, 320 A.2d 688, 692 (Me. 1974) (same); *Warren* v. *Employers' Fire Ins. Co., Boston, Mass.*, 53 N.J. 308, 311, 250 A.2d 578 (1969) ("[a]lthough the period of limitations is required by statute, the limitation is nonetheless part of the contract and becomes part of the contractual provisions"); 71 N.Y. Jur. 2d, Insurance § 2189 (2000) ("[t]he statutory standard fire insurance policy contains a clause expressly providing that the insurer may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefore is made by the insurer, but it has been recognized that the insurer's right of subrogation under a fire insurance policy does not depend upon such a [subrogation] clause, as it exists independently of any policy provision").

In sum, we reject Middlesex's claim of an inviolate statutory right of subrogation, and we conclude that the Appellate Court properly determined that Middlesex's right of subrogation was equitable in nature.

## II

Accordingly, we must next determine whether the Appellate Court properly extended this court's opinion in *DiLullo* v. *Joseph*, supra, 259 Conn. 847, which precluded an insurer from pursuing an equitable subrogation action against a negligent tenant, to a situation involving a negligent houseguest.

"The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." *Kakalik* v. *Bernardo*, 184 Conn. 386, 395, 439 A.2d 1016 (1981); *Robert Lawrence Associates, Inc.* v. *Del Vecchio*, 178 Conn. 1, 18–19, 420 A.2d 1142 (1979); *Gager* v. *Gager & Peterson,*

*LLP*, 76 Conn. App. 552, 560, 820 A.2d 1063 (2003). "In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of [the trial court's] action." (Internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 308, 777 A.2d 670 (2001); *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 809, 695 A.2d 1010 (1997). "The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Gillis* v. *Gillis*, 214 Conn. 336, 340–41, 572 A.2d 323 (1990); *Ridolfi* v. *Ridolfi*, 178 Conn. 377, 379, 423 A.2d 85 (1979). When the trial court draws conclusions of law from its balancing of the equities, however, our review is plenary. *Torres* v. *Waterbury*, 249 Conn. 110, 118, 733 A.2d 817 (1999). Moreover, we are mindful that "[s]ubrogation is a highly favored doctrine . . . which courts should be inclined to extend rather than restrict." (Citations omitted.) *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 372.

Before the trial court, the defendant claimed that equitable considerations should prevent him from being held liable in Middlesex's subrogation action.[14] Specifically, the defendant claimed that, because landlords' insurance companies are precluded from bringing sub-

---

[14] Initially, the defendant claimed that, as a social guest of the Waskos, he was a coinsured under the terms of their insurance policy and, therefore, he could not be liable in a subrogation action by Middlesex. Militating against this claim, however, is the clear and unambiguous language of the Waskos' policy, which provides in relevant part: " '[I]nsured means you and residents of your household who are: a. your relatives; or b. other persons under the age of 21 and in the care of any person named above." Accordingly, the trial court properly concluded that the defendant was not a party covered under the terms of the policy. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000) ("Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." [Internal quotation marks omitted.]).

rogation actions against tenants, and a social houseguest is akin to a tenant, insurance companies similarly should be precluded from bringing subrogation actions against social houseguests. The trial court rejected the defendant's argument. On appeal, however, the Appellate Court noted that "the actual relationship between the insured and the defendant is more compelling than whether the defendant fits into a category of coinsureds, as contractually defined." *Wasko* v. *Manella*, supra, 74 Conn. App. 40. Analyzing the defendant's claim further, the Appellate Court concluded that a social guest is akin to a tenant, not for purposes of being a coinsured party under the host's policy,[15] but rather for the purposes of the equity of the situation. Id., 38. More specifically, relying upon the principles of equitable subrogation set forth in *DiLullo* v. *Joseph*, supra, 259 Conn. 853–54, the Appellate Court concluded that it would be "inequitable to permit the homeowner's insurer to have a right of subrogation against the homeowner's guest." *Wasko* v. *Manella*, supra, 41. This reliance on *DiLullo* was misplaced.

In *DiLullo*, the issue before this court was whether, in the absence of a specific agreement between the landlord and the tenant, the landlord's fire insurer had a right of subrogation against a tenant for negligently causing a fire that damaged the insured's property. *DiLullo* v. *Joseph*, supra, 259 Conn. 848. We answered that question in the negative, and affirmed the judgment

---

[15] The Appellate Court noted that the defendant was not a coinsured under the clear and unambiguous terms of the Waskos' insurance policy. *Wasko* v. *Manella*, supra, 74 Conn. App. 37. In addition, the Appellate Court noted that this court explicitly declined to adopt the " 'implied co-insured' " theory in *DiLullo* v. *Joseph*, supra, 259 Conn. 853. *Wasko* v. *Manella*, supra, 42. Under the implied theory, "the tenant is deemed to be a coinsured of the landlord because: (1) both parties have an insurable interest in the premises, the landlord as owner, and the tenant as possessor, of the fee; and (2) the tenant's rent presumably includes some calculation of the landlord's fire insurance premium." *DiLullo* v. *Joseph*, supra, 851.

rendered by the trial court in favor of the tenant. Id., 850. Two rationales supported our conclusion: (1) "[o]ur strong public policy against economic waste," which would not be served by requiring multiple insurance policies on the same piece of property; and (2) "the likely lack of expectations regarding a tenant's obligation to subrogate his landlord's insurer . . . ." Id., 851. Neither of those two rationales are found in a situation where, as in the present case, a social houseguest negligently causes a fire that damages a host's property.

In regard to our first rationale in *DiLullo*, we noted that forcing a tenant to carry insurance for the full cost of the building would create economic waste, as it would be duplicative of the insurance carried by the landlord; further, this economic waste would be compounded by the number of tenants in a particular building. Id., 854. In a situation such as the one found in the present case, the insured has a fire insurance policy covering the home. Therefore, if the insured, or another individual covered by the policy, negligently were to burn the home down, that fire insurance policy would cover the loss.[16] The Appellate Court was concerned that giving an insurer a right of subrogation against a negligent guest, who was not covered by the terms of the insured's fire insurance policy, would be "wasteful [in that it would] require that every individual carry insurance on every building he or she enters, if only briefly, to avoid the consequences of a subrogation suit." *Wasko* v. *Manella*, supra, 74 Conn. App. 39. This concern is unwarranted, however, because the negli-

---

[16] As Judge Peters noted in her dissenting opinion, the standard form of fire insurance does not require a fire insurance company to cover losses caused by permissive users of the insured property. *Wasko* v. *Manella*, supra, 74 Conn. App. 47–48. Compare § 38a-334-5 (d) of the Regulations of Connecticut State Agencies (requiring insurance companies to cover losses caused by permissive users of automobiles under automobile insurance policies issued in Connecticut).

gent acts of a social houseguest would already be covered by his or her existing third party liability coverage, such as provided by a homeowner's or renter's insurance policy.[17] Therefore, there is no need for a social houseguest to purchase an additional traveling or temporary first party fire insurance policy on the host's property. The social guest will be covered in the same manner as he or she would be in any other situation where he or she negligently caused injury to another—through traditional third party liability coverage.

Furthermore, as the Appellate Court noted in its opinion, rather than submitting a claim to the insurer, an insured host could proceed directly against the houseguest in an action for negligently caused damages to the insured property. Id., 42. Indeed, that is the exact situation found in the present case—the Waskos instituted the original action against the defendant, and Middlesex was substituted as the plaintiff after paying for the damage to the Waskos' home. If the insured property owner can bring an action to recover for negligently caused damages against the defendant, we see no reason why an insurer that pays for the property owner's loss cannot also bring an action against the defendant. Put another way, we see no reason why it is equitable to permit a property owner to proceed against a negligent houseguest's current insurance policy, yet it is inequitable to permit an insurance company that has paid out to its insured to proceed against that same policy. See *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 372 ("courts should be inclined to extend rather than restrict" subrogation). In either situation, the houseguest's current third party liability insurance coverage will protect against liability, and there is no need

---

[17] Black's Law Dictionary (7th Ed. 1999) defines "homeowner's insurance" as "[i]nsurance that covers both damage to the insured's residence and liability claims made against the insured ([especially] those arising from the insured's negligence)."

for houseguests to obtain the additional policies envisioned by the Appellate Court. Accordingly, there is no significant concern of economic waste in the present case.

Our second rationale in *DiLullo* v. *Joseph*, supra, 259 Conn. 851, namely, the lack of expectation of subrogation on the part of a tenant, also is not found in the present situation. In *DiLullo*, we endorsed the statement that: "The possibility that a lessor's insurer may proceed against a lessee almost certainly is not within the expectations of most landlords and tenants unless they have been forewarned by expert counseling." (Internal quotation marks omitted.) Id., 852; R. Keeton & A. Widiss, Insurance Law (1988) § 4.4 (b), pp. 340–41. Contrary to the protestations of the defendant's counsel at oral argument before this court, we are convinced that social houseguests do not proceed with the same lack of expectations regarding personal responsibility for negligent conduct as do tenants. Put another way, we believe that most social guests *fully expect* to be held liable for their negligent conduct in another's home—whether that conduct constitutes breaking the television, causing physical injury, or burning the house down. Unlike tenants, social guests have not signed a contract with the host, they have not paid the host any set amount of money for rent, and, accordingly, they do not have the same expectations regarding insurance coverage for the property as do tenants. In sum, the equitable concerns that led this court to preclude subrogation in the context of landlord and tenant simply are not present in the context of houseguest and host.

A more appropriate source of guidance on the equity involved in allowing subrogation in the present situation is our decision in *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 362. In that case, the plaintiff insurance company became obligated to pay uninsured motorist benefits to its insured when the defendant

insurance company of the tortfeasor denied coverage. Id., 367. Subsequently, the plaintiff brought an action against the defendant to recover the money that it had paid to its insured. Id. The trial court granted the defendant's motion to strike the plaintiff's complaint, and the plaintiff appealed. Id., 363–64. As an initial matter, this court determined that the plaintiff was proceeding under the theory of legal or equitable subrogation, because it was "stepping into the shoes of the party it paid in order to recover the payments that it made, and thus to prevent the unjust enrichment of the party whose debt it paid." Id., 367.

We explained further that in an equitable subrogation matter, "[t]he insurer was not acting as a mere volunteer; rather, it was obligated by a preexisting contract of insurance to pay the losses of its insured. Upon such payment, the insurer became subrogated to any rights that its insured might have had against the party who had caused the loss. The tortfeasor, who was the party primarily liable for the losses sustained by the insured, benefited by the insurer's payment of a debt truly owed by the tortfeasor. We see no logical reason to permit a tortfeasor to be unjustly enriched by virtue of having its debt paid by the insurance company of a party who had the foresight to obtain insurance coverage, and thus to escape all liability for its wrongdoing, simply because the insurance company was not permitted to participate in a suit against the tortfeasor in order to recover the money that it had paid to its insured but which was properly payable by the tortfeasor." Id., 372–73. Accordingly, we overruled *Berlinski* v. *Ovellette*, supra, 164 Conn. 482, which had precluded providers of uninsured motorist coverage from bringing subrogation actions against uninsured tortfeasors, and we reversed the judgment of the trial court. *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 375.

We find the reasoning of *Westchester Fire Ins. Co.* to be particularly instructive to the present case. As discussed previously in this opinion, the Waskos could have pursued their own negligence action against the defendant, rather than submitting and settling their claim with Middlesex. Indeed, as the Appellate Court noted, "one of the benefits of purchasing homeowners insurance is that the insureds need *not* sue their guests who negligently cause damage, even though they would be within their rights to do so." (Emphasis in original.) *Wasko* v. *Manella*, supra, 74 Conn. App. 42; see also *Reeder* v. *Reeder*, 217 Neb. 120, 129, 348 N.W.2d 832 (1984) ("[i]t may be presumed that the insured bought this policy so that he would not have to look to his guest for payment in the event of damage caused by the negligent act of the guest").[18] Thus, in the present case, just as in *Westchester Fire Ins. Co.*, the defendant benefited by an insurance company's payment of a debt truly owed by him. Furthermore, just as in *Westchester Fire Ins. Co.*, we see no logical reason for the defendant to be unjustly enriched merely because he burned down the home of a party that had the foresight to purchase fire insurance, and subsequently chose to submit a claim to that insurance company rather than to proceed directly against him.

---

[18] The Appellate Court found "the reasoning in *Reeder* v. *Reeder*, [supra, 217 Neb. 120], to be persuasive. In *Reeder*, a guest caused fire damage to the house at which she was staying, and the trial court denied the host's insurer the right of subrogation." *Wasko* v. *Manella*, supra, 74 Conn. App. 40–41. For two reasons, we disagree that *Reeder* offers persuasive reasoning to the present case. First, *Reeder* involved a unique factual scenario in which one brother owned the home, yet another brother and his family were living in it for an extended period of time while they searched for a house of their own. *Reeder* v. *Reeder*, supra, 121–22. Second, there was "undisputed evidence" that the owner had told his brother that "he would 'leave [his] insurance policy that I had on it while he was in there.' " Id., 128. The present case involved a more distant relationship between the parties, a much shorter stay at the home and no explicit reference by the hosts that the guest's actions would be covered under their insurance policy.

Precluding an insurer from bringing a subrogation action against a social houseguest who negligently caused a fire that damaged the insured's property could also lead to unjust results. First, it is contrary to the main principle behind equitable subrogation because it "denies the [insurer] the opportunity to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it." (Internal quotation marks omitted.) *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 373. Second, it may also encourage insurers to attempt to deny coverage for losses to property they insure, given that the insured party would maintain the right to proceed against the responsible party, while the insurer would not.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

In this opinion the other justices concurred.